USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 3 0 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                              :

BARNEY J. NG, as the Sole Trustee of the  :
Barney J. Ng Living Trust,               :
                              :

               Plaintiff,  :        No. 10 Civ. 8347 (RA)
                              :

        -v-              :        OPINION AND ORDER
                              :

STEPHEN SCHRAM,                :
                              :

               Defendant.  :
                              :

-----------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

      Plaintiff Barney Ng, as the sole trustee of the Barney J. Ng Living Trust (the "Trust"),

brings this breach of contract action against Stephen Schram to recover $5 million allegedly

owed on a personal guarantee. Schram denies liability and asserts a counterclaim against Ng for

breach of a separate agreement releasing him from the guarantee. Before the Court are Ng's

motion for summary judgment on his claim and Schram's counterclaim, as well as Schram's

motion for summary judgment on Ng's claim. For the following reasons, both motions are

denied.

## I.    Background

###     A.    Factual Background[1]

---

[1]    The facts recited below are drawn from the following Rule 56.1 statements and the exhibits incorporated
therein: Ng's Rule 56.1 statement in support of his motion for summary judgment ("Pl. 56.1") (Dkt. No. 26),
Schram's response thereto ("Def. Resp. 56.1") (Dkt. No. 31), Ng's Rule 56.1 statement in further support of his
motion ("Pl. Reply 56.1") (Dkt. No. 35), Schram's Rule 56.1 statement in support of his motion for summary
judgment ("Def. 56.1") (Dkt. No. 32), Ng's response thereto ("Pl. Resp. 56.1") (Dkt. No. 41), and Schram's Rule
56.1 statement in further support of his motion ("Def. Reply 56.1") (Dkt. No. 45). Where only one party's Rule 56.1
statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute the
fact, or merely objects to inferences drawn from the fact.

Ng is the former president of Bar-K, Inc. ("Bar-K"), a corporation that pursued real estate investment opportunities for R.E. Loans, LLC ("R.E. Loans"), a real estate investment fund. Schram is the chairman of DPS ("DPS"), a real estate development firm.  This case arises from R.E. Loans' investment, through Ng's efforts, in a piece of property in Wyoming that was being developed by Schram's company, and contracts entered into as part of this transaction.

### 1.    Financing of the Snake River Resort Project

At some time prior to December 2004, Canyon Club, Inc. ("CCI"), a Wyoming corporation controlled at the time by Richard Edgcomb, purchased a 540-acre resort development in Jackson Hole, Wyoming (the "Property").   (Pl. 56.1 ¶ 10.)   After the development project went into bankruptcy, in December 2004, as part of its reorganization, Ng, on behalf of Bar-K, arranged for R.E. Loans to provide $64 million in financing to CCI.  (Id. at ¶ 11.)  This financing took the form of a promissory note (the "Note") that was secured by mortgages on the Property as well as approximately 144 acres of adjacent land also owned by Edgcomb (the "Mortgages").  (Id. at ¶ 12.)  Also as part of the reorganization, CCI and DPS formed the Snake River Sporting Club Development Company, LLC (the "Company") for the purpose of completing the resort development.  (Def. Resp. 56.1 ¶ 13.)  CCI owned 80% and DPS owned 20% of the Company.  (Stephen Schram Dep. ("Schram Dep.") 51:16-24.)  DPS served as the manager of the project.  (Id. at 8:17-18.)

In return for Bar-K's assistance in procuring the R.E. Loans financing, the Company agreed to pay it a $9 million fee.  (Pl. 56.1 ¶ 14.)  Bar-K agreed to defer payment of the fee, which was memorialized in a non-interest bearing note dated December 22, 2004 that was also secured by the Mortgages (the "Second Note").  (Id. at ¶ 15; Barney Ng Aff., Jan. 17, 2013 ("Ng

Aff."), at Ex. 1 (the "Second Note").)[2]   The Second Note was "payable in full" on December 31, 2009, the "[m]aturity [d]ate," (Second Note ¶ 6), however, in the event of a default, "all sums due" under the Second Note "shall be accelerated and shall be immediately due and payable," (id. ¶ 10).   A default under the Second Note was to occur if CCI, the borrower, "fail[ed] to pay any payment required hereunder when due, . . . fail[ed] to fulfill any of its obligations under the Loan Agreement[,][3] or  . . . fail[ed] to fulfill any of its obligations under the Mortgage," among other events.  (Id.)  Subsequently, on January 7, 2005, Bar-K assigned $5 million of the Second Note to the Trust.  (Pl. 56.1 ¶ 16; Ng Aff. Ex. 2.)

### 2.     Efforts to Remedy the Company's Financial Troubles

By the middle of 2007, the line of credit provided to the development project by R.E. Loans was "about to run out," and "without a new source of funds . . . there was no money available to continue the development costs to finish the project."  (Isaac Tyler Congleton Dep. ("Congleton Dep.") 15:2-16.)  As of October 19, 2007, the Company had "no positive news on [its] search" for an additional $20 million in financing.  (Randy Merritt Aff., Mar. 27, 2013 ("Merritt Aff."), at Ex. 5.)  Tyler Congleton, DPS's vice president of finance and development, reported to Ng, Schram, Edgcomb, Peter Pollack, a principal of DPS, Glenn Ford, counsel for CCI, and John Osnato, counsel for DPS, that the "project and debt load [were] a very tough sell in this current real estate financing environment," and that the Company "expect[ed] . . . to default on interest payments" due on November 1, 2007 and considered delinquent on November 10, 2007, "in the absence of new financing."  (Id.; see also Congleton Dep. 12:19-20.)

Schram, Congleton and Ng, among others, subsequently engaged in several discussions "about how to recapitalize or how to put more money into the project."  (Schram Dep. 11:17-25.)

---

[2]      The Note and Second Note are collectively referred to as the "Notes."

[3]      The "Loan Agreement" appears to refer to the Note.  (Pl. Ex. 1.)

They discussed several financing options, but ultimately proposed an agreement whereby CCI and Edgcomb would be separated from the Company.  (Congleton Dep. 36:21-37:8; Stephen Schram Aff., Feb. 11, 2011, ("Schram Aff.") ¶ 4 (describing it as a "'divorce' of Edgcomb and all his entities from [the] resort").)   According to Congleton, Ng had expressed his "continuing belief that [] Edgcomb was a source of the problems . . . and did [not] want to be involved with [Edgcomb] going forward."  (Congleton Dep. 34:2-11.)  Schram also "wanted Edgcomb out of the project."  (Schram Aff. ¶ 7.)

In furtherance of this plan, Congleton recalled that Ng proposed two "temporary steps"— that R.E. Loans would take over the board and Schram would provide a "guarantee until [] Edgcomb [was] out."  (Congleton Dep. 37:9-19, 46:13-20.)  Edgcomb would get back the 144-acre adjacent lot and two additional lots from the Property, among other things.  (Id. at 46:13-16.)  This was an effort to "facilitate saving" the property and to get Edgcomb to agree to this proposal.  (Schram Dep. 39:21-24 ("Barney said, 'Steve, I need this because Dick Edgcomb will feel more comfortable if it is on or part of the agreement.'"), 145:15-19 ("Ng was my partner, we were trying to facilitate saving this development.  He asked me[,] as my lender that we owed $65 million to, to do this so that Dick Edgcomb would sign this agreement."); see also Congleton Dep. 38:11-17.)  Ng could not recall who first proposed the guarantee but agreed that it was "important [to Edgcomb] agreeing to the final separation."   (Barney Ng Dep. ("Ng Dep.") 125:16-126:4.)  According to Schram and Congleton, Ng stated that the guarantee was "totally unenforceable" and "not a real guarantee."  (Schram Dep. 13:15-16, 148:13-24; Congleton Dep. 46:19-47:8.)  Ng allegedly further stated, "There is going to be no follow-up paperwork that

would make this a real guarantee.  There will be no filings.  This will not be part of it." (Schram

Dep. 148:15-19; see also Congleton Dep. 37:16-19.)[4]

By November 15, 2007, the parties were drafting a proposed separation agreement.  (Ng

Aff. Ex. 3.)  On November 16, 2007, in an email to Congleton, Joel Rudell, counsel for DPS, and

Schram, among others, Ng stated that the "following terms should be added to the agreement:"

> 1: 51% of the voting rights of the board of directors will be given to Barney Ng.
>
> 2: Steve Schram will personally guarantee the existing loans of RE Loans and Barney Ng.  (by Separate agreement between the lenders and Steve Schram a further agreement will release Steve Schram's personal guarantee if $1,820,000.00 in principal is paid down on lots 13 and 19 within 2[]years of this agreement).  If this is unacceptable to Steve, please contact me to discuss.
>
> 3: In return for these items, the existing loans will not default [the Company] for 3 months.

(Id.)  He further wrote:

> I believe it most efficient if these are added to a universal agreement.  It identifies the terms of the overall agreement to everyone (except for the separate agreement between Steve Schram and the lenders).  I think this is important due to the nature in which this agreement was negotiated.
>
> I reiterate that time is of the essence.  It is imperative to realize that there is a default in existence presently and Dick Edgecomb (sic) has a history of changing his mind.  Nothing is for certain till an agreement is signed by all parties.

(Id.)  Schram testified that he and Ng "probably discuss[ed]" the guarantee after Ng sent the

November 16th email, although he did not recall anything from such conversations.  (Schram

Dep. 37:7-24.)

---

[4]      Schram submits for the Court's consideration handwritten notes from a meeting attended by Schram, Ng and Congleton on November 14, 2007.  (Harold McGuire, Jr. Decl., Feb. 15, 2013 ("McGuire Decl."), ¶ 5 Ex. 102.)  Congleton testified that the handwriting in red ink is his and the handwriting in blue ink is Ng's.  (Congleton Dep. 42:17-43:21.)  Ng, however, objects to the admission of this note as hearsay.  Because the Court is not relying on this document, it need not rule on its admissibility.  Moreover, to the extent that Ng objects to the admissibility of other pieces of evidence offered by Schram, (see Pl. Reply 56.1 at 1-2), and the Court does not otherwise address such objections, they are denied as moot because the Court has not relied on that evidence.

According to Ng's testimony, at the time he wrote the email, he meant for the existence of a separate release agreement.  (Ng Dep. 127:15-24.)  He insisted that the release provision be by separate agreement "because . . . the original agreement was going to be a universal agreement between all parties, and the release was going to be in or the portion of the release, that was only going to pertain to myself and Mr. Schram, and so not being an attorney, I thought that that was the reason why there should be a separate agreement that would be signed by just the both of us."  (Id. at 131:22-132:8.)  Moreover, Ng's "intent or understanding" at that point in time "was as long as Edgcomb had an interest in the property or any type of claim against the property which would be reflected by this note, that it was still a potential problem, and what [he was] stating" in the November 16th email was "that you have up to two years to pay the $1,820,000 back to Edgcomb in order to – and then the release would occur."  (Id. at 129:9-20.)

Following Ng's November 16th email, the parties continued to negotiate the terms of the separation agreement.   (Congleton Dep. 60:13-16.)   They understood that, from Ng's perspective, "time [was] of the essence, [] his clients were running out of patience, [the Company was] running out of time, and he was going to have to default the project."   (Id. at 61:7-11.)  Although Ng had not put the project in default, the Company understood that it had "formally" or "technically" defaulted.   (Id. at 62:23-63:1; Schram Dep. 91:9-14.)   Indeed, Congleton testified that he believed that Ng set a November 30, 2007 deadline for the completion of the Separation Agreement or default.  (Congleton Dep. 63:5-13.)

On November 30, 2007, before an agreement had been finalized and executed, Ng sent an email to Schram, Edgcomb and Congleton, among others, stating:

> To all involved: Consider this e-mail as notice that the lender is withdrawing all prior concessions that it was willing to make to help you resolve the issues between you.  Next week, you will receive formal notice from our Wyoming counsel initiating foreclosure proceedings as to your respective properties.  It is

unfortunate that the lenders must take this step, but the continued impasse between you permits no alternative. The lender has gone out of its way to try to facilitate a resolution. I regret that all parties could not come to a final agreement.

(Ng Aff. Ex. 4.)

### 3. The Separation Agreement

On December 4, 2007, the following parties entered into a separation agreement with respect to the Company: Schram, the Company, DPS, CCI, Edgcomb and his wife, Carolyn, SRCR Investments, LLC ("SRCR"), a company owned by the Edgcombs, and Ng, on behalf of himself and the Trust, (the "Separation Agreement" or "Agreement"). (Pl. 56.1 ¶ 18; Ng Aff. Ex. 5 ("Separation Agreement").)

Pursuant to the Separation Agreement, CCI "transfer[red] and assign[ed] to DPS[] its membership interest in the Company and all of its ownership interests in any Affiliates of the Company." (Separation Agreement ¶ 2.) DPS thus owned 100% of the Company, (Harold McGuire, Jr. Decl., Feb. 15, 2013 ("McGuire Decl."), ¶ 5 Ex. 4 at 21), however, according to Schram, Ng and R.E. Loans "owned [and] controlled" the project," (Schram Dep. 42:11-13). The holders of the Notes agreed to release from the Mortgages the 144 acres of property owned by Edgcomb. (Separation Agreement ¶ 4.) Moreover, the Agreement provided that "[n]either CCI, nor 144 Acre, LLC, nor [SRCR], nor Edgcomb shall have any liability with regard to the Note and Second Note." (Id. at ¶ 8; see also Pl. 56.1 ¶ 20.)

The Separation Agreement also included the following provision regarding Schram's guarantee (the "Guarantee"):

> Stephen C. Schram ("Schram") irrevocably agrees to guarantee full payment of the Note and Second Note according to their terms. The Company agrees to modify the Operating Agreement to increase the number of members of the Board of Managers to five (5) and to provide that Ng or his designees shall have the right to appoint three (3) members of the Board of Managers. In consideration of the said guaranty and modifications to the Operating Agreement, R.E. Loans,

7

> LLC and Barney J. Ng Living Trust, as the holders of the Note and Second Note,
> respectively, agree not to cause the Note or Second Note to be in default for any
> reason whatsoever prior to March 1, 2008.

(Separation Agreement ¶ 8.)  Rudell, as the drafter of this provision, testified that he included the "minimum [language] needed to express a guarantee and that's all [he] felt [he] had to do in light of [] Ng's email" of November 16, 2007.  (Joel Rudell Dep. ("Rudell Dep.") 88:22-25.)

The Agreement also included a provision that, "[w]ithin thirty (30) days" of the Agreement's effective date, SRCR "will pay down the Mortgage by [$1.82 million] in consideration of which the Company will simultaneously convey to Edgcomb . . . Lots 13 and 19 from the Property free and clear of all liens."  (Separation Agreement ¶ 6.)  Paragraph 6 included additional instructions regarding such payments, which was memorialized in a promissory note.  (Id.)

Finally, paragraph 13 provided that the Agreement "may be amended only by a writing signed and delivered by all parties hereto," paragraph 16 provided that the "Agreement shall be construed and enforced in accordance with the laws of the State of Wyoming," and paragraph 18 provided that the "Agreement constitutes the entire agreement among the parties with respect to the subject matter of this Agreement."

Schram signed the Agreement on behalf of himself, the Company and DPS.  (Id. at 12.) Schram had discussed drafts of the Agreement with his attorney, he reviewed the Agreement before signing it, and he did not sign it under duress.  (Schram Dep. 98:15-18, 130:21-131:15, 143:7-9.)  According to Schram, signing the Agreement was "the best thing to do at the time" because if he had not done so, "the lender would have foreclosed on [the Property]."  (Id. at 98:7-18.)

It is undisputed that Ng did not place either Note into default prior to March 1, 2008.  (Pl. 56.1 ¶ 31.)

### 4.     The Release Agreement

According to Schram, in addition to the Separation Agreement, he and Ng entered into a separate release agreement to relieve Schram of the personal guarantee (the "Release Agreement").  (Schram Dep. 14:2-16:24, 36:5-37:6.)  This was consistent with Schram's view that his guarantee "was not a real guarantee that [he] was offering, [it] was window dressing that was going to allow [Ng] to get this agreement signed."  (Id. at 39:7-10.)  The agreement was both oral and written.  (Id. at 14:2-15:25, 35:23-37:24.)  Schram and Ng had "discussed that once [Schram] had fulfilled or once the obligation of the payment of the [$1.82 million] had been fulfilled," Schram "would receive . . . some type of memo saying that this had been fulfilled and that, you know, any and all issues had been resolved."  (Id. at 16:11-17.)  The language in Ng's November 16, 2007 email—"by Separate agreement between the lenders and [] Schram a further agreement will release [] Schram's personal guarantee if $1,820,000.00 in principal is paid down on lots 13 and 19 within 2 years of this agreement"—memorialized this offer.  (Schram Aff. ¶ 13 ("I construed Ng's email . . . as an offer to enter into the 'separate' and 'further' Release Agreement."); Schram Dep. 14:5-15:25, 36:18-37:6 (the email was "very clear . . . and there was really very little discussion [] after that.  The separation agreement was prepared and it reflected exactly what this e-mail said."); see also Rudell Dep. 75:13-22 (pursuant to Ng's November 16th email, the release agreement "was something that was going to be taken care of with a separate understanding . . . and so it was not something I was going to be putting into [the Separation Agreement].").)  Schram asserts that, by signing the Separation Agreement, he was accepting Ng's release offer.  (Schram Dep. 14:5-15:25, 129:6-130:7, 144:2-11; Schram Aff. ¶ 13 ("I

9

accepted that offer when I placed my signature upon the final version of the Separation Agreement, which I would never have done without the Release Agreement.").)

Although Ng has acknowledged that he meant for the existence of a separate release agreement at the time he wrote the November 16th email, he disputes that the Release Agreement was ever entered into because he claims that his November 30, 2007 email withdrew his offer. (Ng Aff. ¶ 8 (The email "put[] them on notice that the lender was withdrawing all prior concessions that it had been willing to make to help them resolve the issues among them."); id. at Ex. 4; Pl. Mem. 22-23.) Schram, on the other hand, contends that the November 30th email was not a withdrawal of his offer, but was meant to "put pressure on [Edgcomb] to get this signed," because Ng "wasn't getting from [him] and his attorney what he wanted." (Schram Dep. 120:6-24.) The email, according to Schram, "had nothing to do" with his "deal," it only related to Edgcomb's "deal." (Id. at 124:23-125:15, 120:6-24.) Schram has submitted an unsigned, draft HUD real estate closing form that reflects that SRCR paid off the first mortgage to R.E. Loans in the amount of $1,820,000. (McGuire Decl. ¶ 5 Ex. 108; see also Congleton Dep. 72:6-13 (This payment "was significant because . . . in our mind and in Barney's it was, you know, this technical trigger that he said he needed to never ask for the guarantee.").)[5]

### 5.    Subsequent Events and Default

In September 2008, shortly before the Company went into bankruptcy, Schram asked Ng to sign a confirmation that he had been released from the obligations of the Guarantee, to which Ng did not respond. (Pl. 56.1 ¶ 47.) As of October 25, 2010, the Notes were in default, and due to events not relevant to this action, Ng avers that the property securing the Notes were of

---

[5]    Ng disputes this fact as unsupported by the evidence and objects to the admissibility of the HUD form as "inadmissible hearsay and an unsigned unauthenticated draft document." (Pl. Reply 56.1 ¶ 65.) As discussed below, there remains a question of fact as to whether the $1.82 million was paid and what relation, if any, it has to the enforceability of the Guarantee.

insufficient value to payoff the notes.  (Ng Aff. ¶ 12.)  Accordingly, on October 25, 2010, Ng made a demand for Schram to make payment under the Guarantee, which Schram refused to do. (John Shaeffer Aff., Jan. 17, 2013 ("Shaeffer Aff."), ¶ 5.)

### B.  Procedural History

Ng commenced this action on November 4, 2010 against Schram for breach of the Guarantee provision of the Separation Agreement.  On December 28, 2010, Schram answered Ng's complaint and filed a counterclaim against Ng alleging that Ng breached the Release Agreement.  On September 21, 2011, the Honorable Thomas P. Griesa, to whom this case was previously assigned, converted Ng's motion to dismiss Schram's counterclaim into one for summary judgment and denied the motion.  (Sept. 21, 2011 Opinion (Dkt. No.11).)  Judge Griesa concluded that there were factual issues that could not be resolved on the record before him.  He wrote:

> These issues mainly relate to the purpose and intent lying behind Ng's e-mail proposing what he calls a separate agreement and a further agreement.  There are also issues about what occurred between the time of Ng's November 16, 2007 e-mail and the execution of the Separation Agreement.  It is also certainly true that the Separation Agreement is highly complex, and that there may be issues relating to its interpretation and also relating to how it was carried out with respect to the Note and the Second Note.  There is also a dispute about whether the $1.82 million was or was not paid.

(Id. at 9.)

The case was subsequently reassigned to this Court and after conducting additional discovery, the parties filed the pending cross-motions for summary judgment.  For the following reasons, the parties' motions are denied.

## II.  Standard of Review

Summary judgment may be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that it is entitled to summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  In reviewing the record, the Court must assess the evidence in "the light most favorable to the [non-moving party]" and resolve all ambiguities and draw all inferences in its favor.  See Tufariello v. Long Island R.R. Co., 458 F.3d 80, 85 (2d Cir. 2006).  A party opposing summary judgment must put forth more than a "scintilla of evidence."  Anderson, 477 U.S. at 252.  It "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements."  See Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996).  The non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248.

When cross-motions for summary judgment are made, the same standards apply.  See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Id.

### III.   Discussion

The parties agree that Wyoming law governs this matter in light of the choice of law provision in the Separation Agreement.  (Separation Agreement ¶ 16.)  This includes application of the parol evidence rule, which is a rule of substantive law.  Soppe v. Breed, 504 P.2d 1077, 1078-79 (Wyo. 1973).  Accordingly, the Court applies Wyoming law to the parties' claims.

#### A.   The Guarantee

At issue in the parties' cross-motions for summary judgment on Ng's breach of contract claim is the validity and enforceability of the Guarantee, which is set forth in paragraph 8 of the Separation Agreement as follows:

> Stephen C. Schram ("Schram") irrevocably agrees to guarantee full payment of the Note and Second Note according to their terms.  The Company agrees to

12

> modify the Operating Agreement to increase the number of members of the Board of Managers to five (5) and to provide that Ng or his designees shall have the right to appoint three (3) members of the Board of Managers.  In consideration of the said guaranty and modifications to the Operating Agreement, R.E. Loans, LLC and Barney J. Ng Living Trust, as the holders of the Note and Second Note, respectively, agree not to cause the Note or Second Note to be in default for any reason whatsoever prior to March 1, 2008.

(Separation Agreement ¶ 8).  Schram contends that the Guarantee is unenforceable, while Ng asserts that the Guarantee is a valid agreement that Schram has breached in his failure to pay the amount due to the Trust on the Second Note.

As an initial matter, the Court notes that the language of the Guarantee is unambiguous and its examination of it is thus "confined to the 'four corners' of the document to construe the intent of the parties."  See Prudential Preferred Props. v. J & J Ventures, Inc., 859 P.2d 1267, 1271 (Wyo. 1993).  Pursuant to the parol evidence rule, therefore, extrinsic evidence, such as Schram's and Congleton's allegations that the guarantee was "not real," will not be examined in assessing the parties' intent in entering into this agreement.  See id. ("Without a valid reason for variance, the intent of the parties stated in their agreement must be given effect."); see also Belden v. Thorkildsen, 156 P.3d 320, 325 (Wyo. 2007).

In his motion, Schram contends that the Guarantee is unenforceable for lack of consideration.  "The law of guarant[ee] is part of general contract law."  Moorcroft State Bank v. Morel, 701 P.2d 1159, 1161 (Wyo. 1985).  Thus, as like any other contract, to form a lawfully enforceable guarantee, the party seeking to recover under the contract must show there was an "offer, acceptance and consideration."  Prudential Preferred Props., 859 P.2d at 1272.  "Lack of consideration goes to the validity of contract formation.  Absent some indicia of actual consideration, a contract will be held invalid by the courts."  Id. (quoting Miller v. Miller, 664 P.2d 39, 41 (Wyo. 1983)).

13

"A generally accepted definition of consideration is that a legal detriment has been bargained for and exchanged for a promise." Moorcroft State Bank, 701 P.2d at 1161. "A performance or a returned promise must be bargained for. . . . The performance may consist of an act, other than a promise, or a forbearance, or the creation, modification or destruction of a legal relation." Id. at 1162. "[V]aluable consideration . . . may consist of [an] exchange of mutual promises, which promises impose a legal liability upon each promisor." Carroll v. Bergen, 57 P.3d 1209, 1214 (Wyo. 2002) (internal quotation marks omitted). In the context of a guarantee, "[w]hen the guarantor is not a part of the original transaction of the principal obligor, his promise must be supported by separate consideration." Moorcroft State Bank, 701 P.2d at 1161.

Schram contends that the "recital of consideration" in paragraph 8 of the Separation Agreement is not valid because (1) he "never sought or bargained for or agreed to the separation with Edgcomb or the lightening of Snake River's debt load as consideration for providing his alleged personal guarantee," (Defs. Reply 2-3), (2) there was no consideration "distinct from the recited promises made to [the Company] in connection with the changes to its governing agreements," (id. at 4), (3) the promise not to default was "illusory" because, at least as to the Second Note, it did not become due until December 31, 2009, (Defs. Mem. 13), and (4) to the extent any valid consideration flowed to the Company, that was insufficient to constitute consideration for purposes of Schram's personal guarantee, (id. at 14-15). The Court disagrees.

As with intent, the parol evidence rule "is applicable to a recital of consideration [] where the consideration recited is itself a promise; that is, where the contract purports to be bilateral, the parol evidence rule clearly forbids either party to a writing . . . to show that his own promise

or that of his cocontractor was not accurately stated or was not given, as the writing states, in consideration of the other promise." Kay v. Spencer, 213 P. 571, 573 (Wyo. 19823).

Because Schram was not a party to the Notes, his guarantee must be supported by separate consideration. See Moorcroft State Bank, 701 P.2d at 1161. Pursuant to paragraph 8, in exchange for Schram's personal guarantee, R.E. Loans and Ng agreed to defer declaring the Notes to be in default until March 1, 2008. Despite Schram's argument to the contrary, this promise not to default was not illusory. Rather, the Company understood that it was technically in default on its loan payment on the Note and that Ng, on behalf of R.E. Loans, was consequently contemplating foreclosing on the property due to the default. Schram's argument that this promise was of no value because the Second Note was not payable until December 31, 2009 misrepresents the terms of that note. Although the Second Note was "payable in full" on December 31, 2009, it also expressly provided that upon a default—which occurred if the Company failed to make any payment under the Note or the Second Note—all sums due under the Second Note "shall be accelerated and shall be immediately due and payable." (Second Note ¶ 10.) Thus, by agreeing not to cause the Notes to be in default until March 1, 2008, the Company was able to look for new investors and continue the development project. (See Congleton Dep. 89:17-20, 98:2-99:11.)

Moreover, the fact that this benefit flowed to the Company and not Schram, personally, does not vitiate the sufficiency of consideration. It is well-established that consideration may flow to a third party. See Carrol, 57 P.3d at 1214 ("The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person.") (quoting Restatement (Second) of Contracts § 71 at 172 (1981)); Prudential Preferred Properties, 859 P.2d at 1272 ("Consideration for a promissory note may flow to a third party.").

In <u>Prudential Preferred Properties</u>, the Wyoming Supreme Court recognized that consideration could flow to a third-party but found that the party seeking to recover on a promissory note had provided no consideration to the maker or guarantor of the note or any third parties. <u>See</u> <u>id.</u> at 1272, 1275. For the reasons discussed above, it is distinguishable from the facts before this Court. Moreover, as an owner of the Company, Schram clearly benefited from the lender's promise not to default.

Finally, the fact that the promise not to allow the notes to default was given in consideration for both the Guarantee and the modification to the Company's governing agreement is immaterial. To the extent Schram is arguing that there was no "mutuality of obligation" in their exchange of promises, that argument is rejected by the Court. Having found that the consideration set forth in the Agreement "meets the definition of legal consideration," the Court considers it "sufficient." <u>See</u> <u>Brodie v. Gen. Chem. Corp.</u>, 934 P.2d 1263, 1268 (Wyo. 1997). Indeed, the Wyoming Supreme Court has "long held that absent fraud or unconscionability, [it] will not look into the adequacy of consideration." <u>Id.</u> (citing <u>Laibly v. Halseth</u>, 345 P.2d 796, 799 (Wyo. 1959)). Even if the consideration exchanged imposed a greater obligation on one party over the other, as long as it meets the legal definition of consideration, the Court will not consider its adequacy. <u>See</u> <u>Worley v. Wyo. Bottling Co.</u>, 1 P.3d 615, 623 (Wyo. 2000) ("The demand for mutuality of obligation, although appealing in its symmetry, is simply a species of the forbidden inquiry into the adequacy of consideration, an inquiry in which this court has, by and large, refused to engage.").

Accordingly, Schram's motion for summary judgment on Ng's breach of contract claim is denied. Despite the Court's conclusion that the Guarantee is a valid contract, Ng's motion for summary judgment on this claim is also denied for the reasons set forth below.

### B.       The Release Agreement

Ng moves for summary judgment on Schram's counterclaim alleging breach of the Release Agreement on the ground that Schram cannot "allege or prove the existence of an enforceable contract."  (Pl. Mem. 22.)  He further argues that the parol evidence rule bars consideration of evidence relating to the Release Agreement in determining whether to enforce the Guarantee.  Accordingly, Ng contends, the Court must enforce the Guarantee and grant his motion for summary judgment on both his claim and Ng's counterclaim.  In response, Schram asserts that the parol evidence rule does not bar consideration of such evidence and that there are disputed issues of fact regarding the existence and enforceability of the Release Agreement.  The Court agrees that there are disputed issues of fact, thus precluding summary judgment on Schram's counterclaim.

"The existence of a contract requires a meeting of the minds of the parties to it."  Wyo. Sawmills, Inc. v. Morris, 756 P.2d 774, 775 (Wyo. 1988).  "An unconditional, timely acceptance of an offer, properly communicated to the offeror, constitutes a meeting of the minds of the parties and establishes a contract."  Id.   "Whether a contract has been entered into depends on the intent of the parties and is a question of fact."  Id.; see also Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1112 (10th Cir. 1991) ("Issues such as whether a contract has been entered into and the terms of the alleged contract are generally questions of fact to be resolved by the fact finder.").  This applies to both written and oral contracts.  See Wyo. Sawmills, Inc., 756 P.2d at 775-76.

"Under the 'objective theory' of contract formation, contractual obligation is imposed not on the basis of the subjective intent of the parties, but rather upon the outward manifestations of a party's assent sufficient to create reasonable reliance by the other parties."  McDonald v. Mobil

Coal Producing, Inc., 820 P.2d 986, 990 (Wyo. 1991).   Wyoming adopts the Restatement (Second) of Contract's explanation of "assent," and thus adheres to the rule that a party's "subjective 'intent' to contract is irrelevant, if [its] intentional, objective manifestations to [the other party] indicated assent to a contractual relationship." Id.

Because there are material questions of fact as to the formation and terms of the Release Agreement, Ng's motion for summary judgment on this claim must be denied.   Although the record before the Court is more developed than it was before Judge Griesa, the questions of fact noted by Judge Griesa in his September 21, 2011 opinion remain at this later stage of the litigation.   For example, there are disputed issues as to what occurred with respect to the purported Release Agreement between November 16, 2007, when Ng sent an email proposing such a separate and further agreement, and December 4, 2007, when the Separation Agreement was executed.   According to Schram, by signing the Separation Agreement, he was accepting Ng's offer of a release, but according to Ng, this offer was withdrawn on November 30, 2007 when he emailed Schram and Edgcomb, among others, stating that "the lender is withdrawing all prior concessions that it was willing to make."   (Ng Aff. Ex. 4.)   This email, however, is ambiguous.   It does not explain which "prior concessions" Ng is referring to, nor does it make any reference to the release offer.   The ambiguity in this email is further supported by Schram's testimony that he interpreted the November 30th email to apply only to the concessions made to Edgcomb, not him.   Moreover, the record suggests that the Guarantee was not formalized through separate documentation and the Company's auditors were informed that there were no outstanding guarantees, which Schram claims is further evidence of Ng's promise to release him

from the Guarantee.   (See, e.g., Schram Dep. 148:20-24; Congleton Dep. 67-1:15, 77:6-83:4; see also McGuire Decl. ¶ 5 Ex. 114.)[6]

As noted by Judge Griesa, questions of fact also exist as to whether the $1.82 million was paid and what effect, if any, such payment would have on the Release Agreement.  Although Ng's November 16th proposal indicates that payment of $1.82 million on the Mortgages of lots 13 and 19 would release Schram from the Guarantee, the Separation Agreement itself provides for the payment of $1.82 million on that same Mortgage, thus making it unclear whether the payment provided for the Separation Agreement did in fact trigger Schram's release.

In light of such disputed issues of fact, summary judgment on Schram's counterclaim must be denied.   Moreover, although the Court has found that the Guarantee is a valid agreement, it does not grant summary judgment to Ng on this claim at this time because its enforceability against Schram might be subject to the Release Agreement, if the jury finds that one was formed.

In reaching this conclusion, the Court rejects Ng's argument that the parol evidence rule would preclude consideration of the Release Agreement, if one is found to exist, when assessing the enforceability of the Guarantee.  The Wyoming Supreme Court has "depart[ed] from the parol evidence rule if the evidence is used to establish a separate and distinct contract, a condition precedent, fraud, mistake, or repudiation."  Belden, 156 P.3d at 324.  The relevant question here is whether the Release Agreement constitutes a "separate and distinct contract." "The parol evidence rule 'does not affect a purely collateral contract distinct from, and independent of, the written agreement, even though it relates to the same general subject matter

---

[6]     Ng objects to the admissibility of Exhibit 114, which is a letter signed by Schram and Congleton and sent to Ernst & Young, the Company's auditors, as hearsay.   The Court will resolve this objection at trial.   Its decision to deny summary judgment would remain the same absent reliance on this document.

and grows out of the same transaction, if it is not inconsistent with the writing.'" Id. at 324-25 (quoting Western Nat'l Bank of Lovell v. Moncur, 624 P.2d 765, 770-71 (Wyo. 1981)).

Contrary to Ng's argument, the Release Agreement is a separate agreement from the Guarantee. Indeed, in his November 16, 2007 email, Ng explicitly referred to the release as a "separate agreement" and he testified to the same. (See Ng Dep. 131:22-132:8.) The fact that Schram deemed his signature on the Separation Agreement to be acceptance of and consideration for the Release Agreement does not prohibit the Court from treating them separately.

Moreover, the Release Agreement is not inconsistent with the Guarantee. While the Guarantee provided for Schram's "irrevocable[]" agreement to guarantee the Notes, the Release Agreement—to the extent there was a valid agreement—merely provided a means by which Schram might be discharged from that obligation. This conclusion is in accord with the Wyoming Supreme Court's ruling in Belden v. Thorkildsen, 156 P.3d 320 (Wyo. 2007), that a "side deal" between the plaintiff and defendant in which the defendant agreed to repay the plaintiff for a note she paid off to the bank could be considered by the court. Id. at 325. In so concluding, the court stated that "[t]his is the type of agreement that is contemplated by the separate agreement exception to the parol evidence rule." Id.[7]

---

[7]     The cases relied upon by Ng in support of his argument that the Release Agreement is inconsistent with the Separation Agreement are distinguishable. In Cordova v. Gosar, 719 P.2d 625 (Wyo. 1986), the court held that parol evidence was admissible to show a mistake but not to alter or enlarge the terms of an agreement. Id. at 640-41. In Jankovsky v. Halladay Motors, 482 P.2d 129 (Wyo. 1971), the court found that the parol evidence rule precluded the plaintiff from using evidence of an oral agreement that contradicted and altered the terms of a written agreement, id. at 133, and in Cary v. Manfull, 287 P. 433 (Wyo. 1930), the court found that the parol evidence rule barred the introduction of evidence that would alter the consideration provided for in a written agreement, id. at 433. By contrast, here, the Release Agreement did not alter the terms of the Guarantee but solely provided for a means by which it might be satisfied or discharged.

Accordingly, because the purported Release Agreement is separate from and not inconsistent with the Separation Agreement, it—to the extent it is found to exist—may be considered as extrinsic evidence in determining whether to enforce the Guarantee.[8]

## IV.    Conclusion

For the foregoing reasons, both motions for summary judgment are denied. The Clerk of Court is respectfully directed to close the motions at Docket Numbers 22 and 27.

A conference has been scheduled in this matter for October 9, 2013 at 4:00 p.m to be held in Courtroom 1506 of the U.S. District Court for the Southern District of New York, 40 Foley Square, New York, New York.

SO ORDERED.

Dated:        September 30, 2013
              New York, New York

Ronnie Abrams
United States District Judge

---

[8]        The integration clause in the Separation Agreement does not alter the Court's conclusion. As stated above, the parties anticipated the existence of a separate agreement for purposes of the release. Indeed, as Ng testified, while the Separation Agreement was a "universal agreement between all parties," the release only "pertain[ed] to [himself] and Schram." (Ng. Dep. 131:22-132:8.)

21